THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
TIMOTHY HAGER, Defendant-Appellant.

First District (3rd Division)   No. 1—92—3476

Opinion filed September 1, 1993.

Rita A. Fry, Public Defender, of Chicago (Greg Koster, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, William D. Carroll, and Eileen Rubin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CERDA delivered the opinion of the court:

After a bench trial on the charge of residential burglary (Ill. Rev. Stat. 1987, ch. 38, par. 19—3), defendant, Timothy Hager, was found not guilty by reason of insanity. He was conditionally released to the Department of Mental Health (DMH). Shortly after he was placed in a residential treatment halfway house, he left without authorization. Subsequently, defendant was arrested for a violation of conditional discharge.

After a hearing pursuant to section 5—2—4 of the Unified Code of Corrections (Ill. Rev. Stat. 1991, ch. 38, par. 1005—2—4), the trial court found defendant subject to involuntary admission and in need of treatment on an inpatient basis. On appeal, defendant asserts that the trial court erred because the unrebutted testimony of the only State witness indicated that he was a danger neither to himself nor others. We reverse.

According to defendant's statements to various psychiatrists, defendant has been mentally ill since 1979 when he was 19 years old. In the spring of 1988, defendant was homeless and supporting himself with a disability check. In April 1988, he began a two-week stay at the Madden Mental Health Center in Maywood, Illinois. During his stay, defendant left the institution, walked for a few days, and ultimately found himself in Chicago Heights. During the trip, defendant had burned himself with hot coals so that he could focus his thoughts.

On April 28, 1988, defendant entered Lorraine Janusek's Chicago Heights home uninvited. He took a shower, put on a robe, ate some of Ms. Janusek's food, and began watching television. When Ms. Janusek came home and found defendant lying on the couch, she called the police. Defendant did not resist arrest and told the arresting officers that he was tired after walking for two days.

On May 26, 1988, Dr. Albert H. Stipes, a staff psychiatrist at the Psychiatric Institute, examined defendant, whom he found in poor contact with reality, and showing evidence of delusions, hallucinations, and disturbance of affect with depressive features. Dr. Stipes reported that defendant said he had snakes in his body, heard people talking with each other (while defendant was alone in a room), and complained of seeing bright lights and small, furry animals. Dr. Stipes concluded that defendant was suffering from major depression of psy-

chotic proportions as well as suicidal thoughts. In Dr. Stipes' opinion, defendant was not fit to stand trial.

On June 13, 1988, the trial court found defendant unfit to stand trial and remanded him to the custody of the DMH on an inpatient basis. While defendant was at a DMH facility, he attempted suicide twice.

After nine months of treatment, defendant was again examined on March 28, 1989. Dr. Stipes and other clinicians found defendant to be in contact with reality and showing no evidence of current psychosis, affective disorder, or any intellectual deficit. It was concluded that defendant was fit to stand trial with medication.

On June 5, 1989, defendant was examined by psychiatrists at the Psychiatric Institute to determine whether defendant was sane at the time of the offense. In the opinions of Dr. Stipes and Paul Fauteck, a staff psychologist, defendant was legally insane at the time of the offense.

The trial court found defendant fit to stand trial and then not guilty of residential burglary by reason of insanity. When the DMH performed a psychiatric evaluation to determine whether defendant was subject to involuntary confinement, it found defendant cooperative, his thought process clear and coherent, and no evidence of hallucinations or overt psychosis. Not only was defendant taking his medication without any problem, but he also understood his need for medication and promised to continue taking it after his discharge.

The DMH doctors concluded that defendant was not a violent person, not a danger to himself or others, and not at risk of leaving treatment without authorization, known as elopement. The DMH recommended that defendant receive mental health services on an outpatient basis.

On September 25, 1989, the trial court conditionally released defendant to the DMH for a period of five years. After two weeks at a halfway house, however, defendant left the facility without authorization, boarded a bus, and headed for his home State of Kansas. A few days later, he checked himself into a Kansas mental hospital.

On July 13, 1990, the State petitioned for a finding that defendant had violated his conditional discharge. The trial court allowed the petition and issued a warrant for defendant's arrest. Defendant was arrested on the outstanding warrant on April 14, 1992, and returned to DMH's custody.

On May 29, 1992, Dr. Stipes examined defendant and found him in contact with reality and with no evidence of active psychosis, mood

disorder, or any intellectual deficit. Dr. Stipes' conclusion was that defendant was fit for trial with medication.

On July 25, 1992, the DMH conducted a psychiatric examination to determine whether defendant was subject to involuntary admission. Dr. Stipes reported that defendant was taking his medication on time and on his own initiative and that his grooming and hygiene appeared good. Furthermore, his speech was coherent with no suicidal or homicidal thoughts. The report also indicated, however, that defendant was a mild-mannered, anxious man who has a tendency to hurt himself when he gets depressed and frustrated.

Dr. Stipes indicated that defendant was an elopement risk because of his pervasive need to move around. Outpatient follow-up had been poor due to defendant's need to move from place to place. There had been an intensification of depression and subsequent suicidal attempts in reaction to prolonged confinement. Defendant has a low tolerance for structure and imposed authority and reacts with anger. When his anger builds up, defendant takes revenge on himself or elopes from the confinement.

At a subsequent court hearing, Dr. Raymond Sipowicz, a DMH clinical psychologist, testified that he and other clinicians examined defendant, who suffers from schizophrenia, schizo-affective type with some depression. Dr. Sipowicz's major concern was that defendant had a pattern of not taking his medication. As a result of defendant refusing to take his medication when he was at the Elgin Mental Health Facility in 1989, he injured himself when his head struck a wall during a severe anxiety attack. In addition, defendant had refused to take his medication while hospitalized at DMH until three weeks prior to the court hearing. In Dr. Sipowicz's opinion, however, defendant did not present an immediate danger to himself or others.

No other evidence was presented. The trial court ruled that defendant was subject to involuntary admission and in need of mental health sources on an inpatient basis. Defendant was remanded to the DMH for seven years.

On appeal, defendant asserts that the trial court erred in finding him subject to involuntary admission because Dr. Sipowicz, who was the State's only witness, unequivocally testified that defendant was a danger neither to himself nor to others. Defendant argues that three of the four incidents presented as evidence that he has harmed himself in the past occurred before his conditional release in 1989 and that there was no evidence that the fourth incident caused him any harm.

Furthermore, defendant contends that he has achieved substantial relief from his affliction as evidenced by the fact that during the three years following his elopement, he did not find it necessary to check himself into a mental health facility.

Finally, defendant claims that the trial court's finding that he violated his conditional discharge is not a basis for involuntary commitment. Thus, defendant maintains that the trial court abused its discretion in entering the order.

■■ In Illinois, a defendant who has been found not guilty by reason of insanity is subject to involuntary admission if he is "mentally ill and *** because of his mental illness is reasonably expected to inflict serious physical harm upon himself or another in the near future; or *** is mentally ill and *** because of his illness is unable to provide for his basic physical needs so as to guard himself from serious harm." (Ill. Rev. Stat. 1991, ch. 38, par. 1005—2—4(a)(1)(A).) If he is not subject to involuntary admission, a defendant is in need of mental health services on an inpatient basis if he "is reasonably expected to inflict serious physical harm upon himself or another and who would benefit from inpatient care or is in need of inpatient care." Ill. Rev. Stat. 1991, ch. 38, par. 1005—2—4(a)(1)(B).

Once a defendant is involuntarily admitted, he may be held only as long as he is both mentally ill and dangerous. (*Foucha v. Louisiana* (1992), 504 U.S. 71, 118 L. Ed. 2d 437, 112 S. Ct. 1780.) As a matter of due process, it is unconstitutional for a State to confine a harmless, mentally ill person. *O'Connor v. Donaldson* (1975), 422 U.S. 563, 575, 45 L. Ed. 2d 396, 407, 95 S. Ct. 2486, 2493.

■■ The burden is on the State to prove by clear and convincing evidence that defendant is subject to involuntary commitment based on his mental condition. (*People v. Williams* (1986), 140 Ill. App. 3d 216, 488 N.E.2d 649.) An order of involuntary commitment is proper where there exists evidence of a person's prior dangerous conduct and a need for inpatient treatment. (*People v. Washington* (1988), 167 Ill. App. 3d 73, 79, 520 N.E.2d 1160.) This evidence must be based on a current evaluation of defendant's conduct and state of mind, including medical evidence that he presents a danger to himself or others as a direct result of the mental disorder. (*People v. Winston* (1989), 191 Ill. App. 3d 948, 962, 548 N.E.2d 406.) Even though a finding of dangerousness must be based on a specific medical opinion regarding defendant's possible future conduct, there does not need to be an expectation of immediate danger. *Winston*, 191 Ill. App. 3d at 962.

■■ Relevant factors in determining a person's dangerousness include evidence of (1) prior hospitalization with the underlying facts of

that hospitalization and (2) defendant not taking his medication in the past and still not perceiving the value of continued medical treatment. (*Washington*, 167 Ill. App. 3d at 80.) Factors that are not sufficient to sustain a finding of involuntary commitment include violations of conditions of release and the possibility that defendant may not comply with the prescribed treatment. (*People v. Smith* (1984), 126 Ill. App. 3d 5, 10, 466 N.E.2d 1226.) The trial court's determination will be reversed only if it is manifestly erroneous. *Washington*, 167 Ill. App. 3d at 79.

■ We reverse the trial court's determination because the State did not meet its burden of clear and convincing evidence. At the court hearing, the only expert to testify was Dr. Sipowicz, who concluded that defendant would not pose a danger to himself or to others in the near future. Although there was evidence of four incidents where defendant was a danger to himself in the past, there was no evidence that defendant had ever been a danger to others.

As to the times that defendant was a danger to himself, two suicide attempts and a severe anxiety attack occurred when he was confined in a mental hospital. Dr. Stipes, who examined defendant prior to the court hearing, reported that defendant has a low tolerance for confinement, which causes him great anxiety and anger.

In addition, those incidents happened when defendant was not taking his medication. According to Dr. Stipes' report, defendant was coherent, had no suicidal thoughts, and was taking his medication on time on his own initiation. Moreover, defendant has a history of finding help at a mental hospital whenever his mental illness becomes acute.

Since the State did not prove that defendant was a danger to himself or others by clear and convincing evidence, he cannot be involuntarily confined. Accordingly, the circuit court judgment is reversed.

Reversed.

TULLY, P.J., and GREIMAN, J., concur.