2016 IL App (3d) 150115

Opinion filed February 10, 2016

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2016

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
|---|---|---|
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-15-0115 Circuit No. 13-CF-1750 |
| DANIEL W. BAILEY, | ) ) ) | Honorable David M. Carlson, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE O'BRIEN delivered the judgment of the court, with opinion.
Justices Lytton and Wright concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant, Daniel W. Bailey, appeals the trial court's ruling that he was in need of mental health services on an inpatient basis following a finding of not guilty by reason of insanity (NGRI). Because we find that the trial court's determination was not manifestly erroneous, we affirm.

¶ 2                                    FACTS

¶ 3    Defendant was charged by indictment with aggravated battery (720 ILCS 5/12-3.05(c) (West 2012)) and battery (720 ILCS 5/12-3(a)(2) (West 2012)). A stipulated bench trial was

held. The parties stipulated that on August 11, 2013, defendant was transported to Silver Cross Hospital, a public place of accommodation, for purposes of a psychological examination. At the hospital, defendant appeared to be extremely psychotic and actively hallucinating. When a nurse directed defendant to return to his hospital room, defendant resisted the nurse and struck her in the abdomen with his fist. A clinical psychologist would testify that defendant's ability to appreciate the criminality of his actions was substantially impaired at the time of the offense.

¶ 4 The trial court found defendant NGRI. The trial court ordered that defendant be remanded to the custody of the Department of Human Services (DHS) on an inpatient basis for an evaluation as to whether defendant was in need of mental health services.

¶ 5 The DHS evaluation, written by Dr. Ghouse Mohiuddin, determined that defendant was in need of mental health services on an inpatient basis. The evaluation considered defendant's criminal and mental health records, as well as an interview with defendant. Defendant's medical records indicated that he had been treated for bipolar disorder since he was 12 years old. During manic episodes, defendant had racing thoughts and exhibited agitation and aggressive behavior. Defendant had a history of noncompliance with his prescribed medications on an outpatient basis. Defendant had a long history of substance abuse and problems with the legal system.

¶ 6 Previously, defendant was admitted to Elgin Mental Health Center (Elgin) in December of 2009 after having been found NGRI of burglary. Defendant committed numerous infractions and rule violations and exhibited aggressive behavior. Defendant was transferred to a higher security mental health facility due to his unpredictable behavior and acting out sexually. Defendant was eventually transferred back to Elgin where he engaged in behavior similar to his previous admission. Defendant was released from Elgin in May 2012 and was referred to outpatient treatment. Defendant was arrested in December 2012 for residential burglary.

Defendant was released from jail on probation on August 2, 2013, and was arrested in the instant case on August 11, 2013.

¶ 7        Since arriving at Elgin for evaluation in the instant case, defendant sporadically attended treatment groups and remained unfocused, anxious, and preoccupied with his court date. Defendant was currently free from signs and symptoms of hallucinations, delusions, mania, racing thoughts, aggression, and inappropriate sexual behavior but continued to be impulsive and irritable. Defendant lacked understanding as to the serious nature of his mental illness and the consequences of neglecting his treatment. To avoid the occurrence of manic episodes resulting in aggressive and dangerous behavior, defendant needed to: gain a full understanding of his mental illness and treatment needs; consistently comply with his medications, treatment groups, and rehabilitation program; and develop a relapse prevention plan and a continuing care plan to ensure the safety of others.

¶ 8        On January 21 and 22, 2015, a hearing was held in the trial court to determine whether defendant was in need of mental health services and, if so, whether he was in need of services on an inpatient or outpatient basis. Dr. Mohiuddin testified that he was asked by DHS to determine whether defendant was in need of mental health treatment. Defendant had been diagnosed with manic bipolar disorder, which was in partial remission because defendant had been taking his medications. Mohiuddin opined that defendant was in need of inpatient treatment. Mohiuddin based his determination on defendant's history of noncompliance with his medications and defendant's lack of insight into his mental illness and substance abuse. Mohiuddin believed that defendant would pose a risk of harm to himself or others if he were not hospitalized at Elgin "[b]ased on his mental illness."

¶ 9       In reaching his determination, Mohiuddin interviewed defendant, reviewed defendant's past psychiatric records, and reviewed defendant's past arrests and police records. In so doing, Mohiuddin learned that defendant had been hospitalized at mental health institutions several times since childhood. Defendant had previously been hospitalized at Elgin after being found NGRI of burglary but was transferred to a higher security mental health center because he posed a high risk of elopement. Defendant had a consistent history of noncompliance with medications on an outpatient basis. Defendant had no remorse for his current crime but rather blamed his father for taking him to the hospital. Defendant did not know why he was charged with a crime.

¶ 10       Since defendant had been at Elgin following the finding of NGRI in the instant case, defendant had been fully compliant with taking his medications but not with attending group therapy. Because defendant was taking his medications, he did not have any hallucinations or psychosis. Defendant had not tried to physically harm himself or any staff members since he arrived at Elgin. Defendant had been intrusive at the nurses' station and had once walked out of the mental health unit without authorization. Defendant was not permitted to leave his unit without being escorted by a staff member. In order to get a building pass to leave his unit, among other things, defendant would have to be completely compliant in attending his recommended therapy groups.

¶ 11       Mohiuddin admitted that it would be possible for defendant to obtain his medication, receive substance abuse treatment, and attend a recovery group concerning emotional and pathological coping skills on an outpatient basis.

¶ 12       Thomas Bailey, defendant's father, testified that he called for help on the day of defendant's arrest because defendant was exhibiting some troubling behavior. Defendant was not on his medications because he had been released from jail one or two weeks prior and had not

4

been able to get his prescriptions filled. Thomas wanted defendant to go to the hospital so that he could be medicated.

¶ 13    Defendant lived at Thomas's home for approximately 10 months while he was out of jail on bond before he was remanded to DHS to be evaluated. While defendant lived with Thomas, defendant properly took his medications. Thomas made sure defendant was taking his medications by checking to ensure that the amount of medication was dwindling. Defendant was able to obtain employment at a construction company for three to four months. Previously, defendant had never kept a job for more than a couple weeks. Defendant did not exhibit any of the behaviors he did on the day of his arrest.

¶ 14    Thomas would allow defendant to live with him if defendant were permitted to receive outpatient treatment. Thomas would be able to help defendant obtain his medications and make sure he took them. Thomas was not concerned for his safety if defendant were to live with him.

¶ 15    Defendant testified that if the judge allowed him to receive outpatient mental health treatment, he would likely try to obtain his own apartment or house. Defendant had a trust fund account with slightly more than $40,000, which he received in a civil settlement. Defendant could stay with his parents when released from Elgin while he was in the process of finding his own housing or he might stay at a motel for a few days. Defendant would see a doctor who had previously treated him. Defendant had his own vehicle and could drive himself to appointments. Defendant would cooperate with DHS and his doctors. Defendant's health insurance was through Medicaid. Defendant would be able to work at a construction company where he had been employed before being remanded to DHS. Defendant's former boss told him that there would be no problem taking defendant back as an employee because there was plenty of work.

¶ 16          Since defendant arrived at Elgin after being found NGRI in the instant case, his primary focus was staying well, being released, and finding gainful employment. Defendant was currently taking his medications every day. Defendant had not done anything violent since he had been remanded to DHS. Defendant was opposed to inpatient care because he knew that he would thrive in an outpatient setting. Defendant did not agree with all the treatment recommendations from his doctors at DHS. Defendant believed he had a support network and the ability to do outpatient treatment.

¶ 17          The trial court found defendant was in need of mental health services on an inpatient basis and remanded him to the custody of DHS. The trial court also noted Dr. Mohiuddin's testimony that defendant exhibited a lack of compliance with his recommended treatment, a lack of insight into his mental illness, and a lack of remorse for his crime. The court found that Mohiuddin's testimony that defendant was a risk to others was uncontroverted. Additionally, the court noted that it did not know what an outpatient treatment plan for defendant would entail in light of the evidence presented at the hearing.

¶ 18                                        ANALYSIS

¶ 19          On appeal, defendant argues that the trial court erred in finding that he was in need of mental health treatment on an inpatient basis. Given Mohiuddin's testimony that defendant had a history of noncompliance with his medications on an outpatient basis and lacked insight into his mental illness, we find that the trial court's determination that defendant was a risk to himself and others such that inpatient treatment was warranted was not manifestly erroneous.

¶ 20          Under section 5-2-4 of the Unified Code of Corrections (730 ILCS 5/5-2-4 (West 2014)), after a finding of NGRI, the trial court shall order the defendant to be evaluated by DHS to determine if the defendant is in need of mental health services. 730 ILCS 5/5-2-4(a) (West

6

2014). DHS is to provide the trial court with a report of its evaluation within 30 days. *Id.* After receiving the report, the trial court must hold a hearing to determine if the defendant is in need of mental health services and, if so, whether the defendant is in need of mental health services on an inpatient or outpatient basis. *Id.*

> " 'In need of mental health services on an inpatient basis' means: a defendant who has been found not guilty by reason of insanity but who due to mental illness is reasonably expected to inflict serious physical harm upon himself or another and who would benefit from inpatient care or is in need of inpatient care." 730 ILCS 5/5-2-4(a-1)(B) (West 2014).

¶ 21    A finding that a defendant needs mental health treatment on an inpatient basis must be established by clear and convincing evidence. 730 ILCS 5/5-2-4(g) (West 2014). Such a finding "must be based upon an explicit medical opinion regarding the defendant's future conduct and cannot be based upon a mere finding of mental illness." *People v. Grant*, 295 Ill. App. 3d 750, 758 (1998). Relevant factors in determining whether a person is reasonably expected to inflict serious harm upon himself or another include "evidence of (1) prior hospitalization with the underlying facts of that hospitalization and (2) defendant not taking his medication in the past and still not perceiving the value of continued medical treatment." *People v. Robin*, 312 Ill. App. 3d 710, 718 (2000). "Even though a finding of dangerousness must be based on a specific medical opinion regarding defendant's possible future conduct, there does not need to be an expectation of immediate danger." *People v. Hager*, 253 Ill. App. 3d 37, 41 (1993). The mere possibility that defendant may not comply with the prescribed treatment is insufficient to sustain a finding of involuntary commitment. *Robin*, 312 Ill. App. 3d at 718.

7

¶ 22 A trial court's determination that a defendant is in need of mental health services on an inpatient basis will not be reversed unless it is manifestly erroneous. *Id.* at 715. "A ruling is manifestly erroneous only 'if it contains error that is clearly evident, plain, and indisputable.' " *People ex rel. Madigan v. J.T. Einoder, Inc.*, 2015 IL 117193, ¶ 40 (quoting *People v. Hughes*, 329 Ill. App. 3d 322, 325 (2002)).

¶ 23 Here, the trial court's determination that defendant was in need of mental health services on an inpatient basis was not manifestly erroneous. While Dr. Mohiuddin acknowledged that defendant was currently taking his medications, he found that defendant was in need of mental health services on an inpatient basis. Specifically, Mohiuddin believed that defendant would pose a risk of harm to himself of others "[b]ased on his mental illness." Mohiuddin also noted that defendant's hospitalization records revealed that defendant had a history of noncompliance with medications on an outpatient basis. Mohiuddin opined that defendant lacked insight into his mental illness and substance abuse. Mohiuddin also testified that defendant lacked remorse for his crime and was not fully compliant with attending therapy groups on an inpatient basis. Based on Mohiuddin's testimony, the trial court's finding that defendant was in need of mental health services on an inpatient basis was not manifestly erroneous.

¶ 24 Defendant challenges Mohiuddin's opinion as improper on the ground that it was "solely based on his mental illness." While Mohiuddin stated that he believed defendant was a danger to himself and others "[b]ased on his mental illness," the totality of Mohiuddin's testimony showed that he did not base this opinion solely upon a finding of mental illness. Rather, Mohiuddin based his finding on defendant's lack of insight into his mental illness and his history of noncompliance with his medications. Mohiuddin also reviewed defendant's past arrest and police records, which showed a history of criminal behavior. It was proper for Mohiuddin to

8

consider these factors in determining whether defendant required mental health treatment on an inpatient basis. See *Robin*, 312 Ill. App. 3d at 717-18.

¶ 25 Additionally, we note that while the State did not introduce Mohiuddin's written evaluation into evidence at the hearing, it is contained in the record and supports Mohiuddin's trial testimony and the trial court's finding. The written evaluation stated that while not taking his medications, defendant has had manic episodes with psychotic symptoms which resulted in aggressive and dangerous behavior, like defendant's instant offense. Due to defendant's lack of understanding as to the serious nature of his mental illness and the consequences of neglecting his treatment, defendant was at risk for a relapse. Defendant needed inpatient care in order to develop a relapse prevention plan and continued care to ensure the safety of others.

¶ 26 Lastly, we acknowledge the testimony of both defendant and defendant's father regarding defendant's purported stability during the 10-month period prior to defendant's remand to DHS. However, their testimony does not negate Mohiuddin's testimony regarding defendant's past noncompliance with his medication and his current lack of insight into his mental illness. While defendant's father testified that defendant would be able to live with him if defendant received outpatient treatment, defendant testified that he would be inclined to seek his own apartment or house and possibly live at a motel while he searched for housing. No evidence was presented at the hearing that defendant had successfully lived on his own in the past. Therefore, the trial court did not err by finding the expert testimony offered by Dr. Mohiuddin outweighed the contradictory testimony offered by defendant and his father.

¶ 27                                             CONCLUSION

¶ 28 The judgment of the circuit court of Will County is affirmed.

¶ 29 Affirmed.